**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

| | |
|---|---|
| DAVID CROSBY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | )  Civil no. 2:12-cv-135-NT |
| F.W. WEBB, COMPANY, | ) |
| | ) |
| Defendant. | ) |

## ORDER ON THE DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT

This case comes before the Court on Defendant F.W. Webb, Company's ("**F.W. Webb**") motion for summary judgment against its former employee, Plaintiff David Crosby's, claims of disability discrimination, failure to accommodate, and retaliation under the Americans with Disabilities Act and Maine Human Rights Act, and for violations of the Maine Family Medical Leave Requirements and the federal Family Medical Leave Act. For the reasons that follow, the Court **DENIES** the motion for summary judgment.

## FACTUAL BACKGROUND

F.W. Webb is a wholesale distributor of plumbing and heating supplies serving New England and eastern New York. Def.'s Statement of Material Facts ("**DSMF**") ¶ 1 (ECF No. 47).[1] F.W. Webb has a 70,000 square foot branch location in South Portland, Maine, which consists of a warehouse, distribution facility, counter

---

[1]     ECF No. 47 is the Plaintiff's response to the Defendant's Statement of Material Facts. When the Court refers to the DSMF, it incorporates the Plaintiff's response thereto, considering only those portions of the statements the Plaintiff either admits or fails effectively to dispute.

sales area, and a retail bath showroom. DSMF ¶ 2. In 2008, forty-three year old David Crosby was employed in F.W. Webb's South Portland warehouse when he began working for the company as a driver. On Friday, October 15, 2009, Crosby was terminated from his job with F.W. Webb.

### 1. Operations at F.W. Webb's South Portland Facility

In 2008-2009, the South Portland facility employed approximately 28 people, including four full-time drivers and a backup driver whose role was primarily to work in the warehouse and also to be available to drive if a driver was out. DSMF ¶ 3. The South Portland facility also supported a smaller F.W. Webb branch operating out of Biddeford, Maine. DSMF ¶ 4. In March of 2009, Robert Blades began working with Mike Cote, the then-manager of the South Portland branch, in a branch development position. Pl.'s Statement of Material Facts ("**PSMF**") ¶¶ 64-65 (ECF No. 51).[2] Between March and September of 2009, Blades was at the South Portland branch approximately two times per week. Pl.'s Resp. to DSMF ¶ 36.

At the end of September, 2009, Blades became the general manager of the South Portland and Biddeford branches. DSMF ¶ 5. Blades had overall profit and loss responsibility for these locations with a focus on sales. DSMF ¶ 6. Paul Grantz was the South Portland Operations Manager reporting to Blades, and Grantz had day-to-day responsibility for operations at this branch. DSMF ¶ 7. Grantz updated Blades when a driver was absent from work in order to prevent service issues. Pl's

---

[2]     ECF No. 51 is the Defendant's Response to the Plaintiff's Statement of Material Facts. When the Court refers to the PSMF, it incorporates the Defendant's response thereto, taking all portions of the Plaintiff's statements supported by record references.

Resp. to DSMF ¶ 9. David Dyer was the South Portland warehouse manager, reporting to Grantz, and Dyer had day-to-day responsibility for supervising South Portland drivers and warehouse personnel. DSMF ¶ 8.

## 2. Crosby's Struggles with Family, Alcohol, and Depression

As of 2008, Crosby had for years been struggling with alcohol abuse. *See* PSMF ¶ 2. In April of 2008, Crosby also began to experience acute anxiety, insomnia, and a "feeling of sadness," which were brought on by troubles in his marriage. PSMF ¶ 1 and attached medical records 7-14 (ECF No. 47-11). He was treated for anxiety on April 4, April 16, and May 21, 2008, and prescribed Lexapro. He was seen on September 3, 2008, for alcohol abuse and his medical records again mention "marital discord." PSMF ¶ 2 and attached medical records 7. On February 6, 2009, Crosby first saw Michelle Sterling, a nurse-practitioner and now Plaintiff's designated medical expert witness, for bronchitis and an "additional concern of depression" stemming from marital issues. DSMF ¶¶ 13-15. Sterling recorded a diagnosis of "depressive disorder NOS."[3] DSMF ¶ 15.

Sterling saw Crosby again on February 23, 2009, and Sterling recommended that Crosby enter an alcohol detoxification program. PSMF ¶ 10. Sterling also recommended that Crosby follow up with her after his treatment to discuss anti-depressant therapy and counseling to treat his depressive disorder. PSMF ¶ 12. Sterling signed a Family Medical Leave Act ("**FMLA**") form requesting leave for Crosby of one month or more so that Crosby could go through alcohol abuse treatment. PSMF ¶ 13.

Crosby took 30 days' leave from work beginning on March 9, 2009, when he checked himself into a residential alcohol treatment program. PSMF ¶¶ 14 and 16. F.W. Webb approved Crosby's FMLA leave, and Crosby took short-term disability benefits during this time. PSMF ¶ 15. F.W. Webb, including then-general-manager Mike Cote, were aware that Crosby requested FMLA leave to address his alcohol dependence. PSMF ¶¶ 15 and 72. Grantz was also aware that Crosby was taking FMLA leave, PSMF ¶ 73, and he believes he would most likely have learned about Crosby's FMLA leave from the general manager. PSMF ¶ 74. Crosby spent five days at the inpatient treatment program. DSMF ¶ 20. While there, Crosby was assessed on the global assessment of function ("**GAF**") scale and rated 36 on a scale of 100. PSMF ¶ 21. This score indicates significant impairment of functioning in multiple areas, including occupational, social, familial, and educational impairment. PSMF ¶ 21. After leaving the program on March 15, 2009, Crosby saw Sterling on March 16, 2009. Sterling did not return Crosby to work due to his need for ongoing treatment for his alcoholism and depression. PSMF ¶ 26.

After his inpatient treatment, Crosby spent the remainder of his 30 days' medical leave attending periodic medical appointments and daily Alcoholics Anonymous meetings. PSMF ¶ 27. On March 26, 2009, Crosby's wife filed for divorce. DSMF ¶ 25. Crosby also had a relapse with alcohol abuse. PSMF ¶ 40. Sterling met with Crosby again on April 2, 2009, where he presented with a depressed mood and hypersomnia in addition to his marriage difficulties. PSMF ¶ 33. At this meeting, Crosby and Sterling discussed anti-depressant therapies and

---

[3]    NOS stands for "not otherwise specified."

Sterling prescribed Zoloft to address Crosby's depression and emotional difficulties. PSMF ¶ 37. Crosby only took Zoloft for two weeks because it did not help with his depression. PSMF ¶ 39.

Crosby's medical leave ended on April 9, 2009. PSMF ¶ 40. After returning to work, Crosby missed a day of work due to his need to recover from drinking alcohol. PSMF ¶ 42. Grantz knew that Crosby was going to Alcoholics Anonymous meetings. PSMF ¶ 76. Grantz also admits that Crosby informed him "several months" prior to October 16, 2009, that he was going through a divorce, but he denies Crosby's assertion that Crosby also spoke with him about his depression or the difficult time he was having with his divorce. PSMF ¶¶ 79-80. Crosby also claims that he told Blades that he was having a hard time emotionally because of his divorce, was going to a doctor for depression, may need some time off, and was thinking about going to Spring Harbor,[4] but that Blades told Crosby that "now is not a good time." DSMF ¶ 46, PSMF ¶¶ 82-84. Crosby thought that this conversation occurred about a month before his divorce became final, i.e., around June of 2009. Pl's Resp. to DSMF ¶ 48.[5]

On Wednesday, October 7, 2009, Crosby was treated at Maine Medical Center for depression related to the loss of his marriage. PSMF ¶ 43 and October 7, 2009 Maine Medical Center record 3-5 (ECF No. 43-17). Crosby reported extreme stress,

---

[4] Spring Harbor is an inpatient facility that treats conditions like depression and substance abuse. PSMF ¶ 83. The Plaintiff admits that no medical provider ever prescribed inpatient treatment for him at Spring Harbor. Def's Resp. to PSMF ¶ 82.

[5] Blades denies that this conversation ever took place and points out that he was not the general manager until September of 2009. *See* Def.'s Resp. to PSMF ¶ 82. But Blades was working at the facility by June of 2009. Taking all inferences in the Plaintiff's favor, a reasonable fact finder could conclude either that the conversation took place as described by Crosby, or that Crosby, while confused about the timeline, nevertheless was telling the truth about this conversation.

grief, and inability to think of anything except the loss of his relationship.[6] He also reported consuming about six alcoholic drinks per day. PSMF ¶ 45. Crosby was given a referral to a therapist as well as information on "Divorce Perspectives," and he was advised to consider medication and attend Alcoholics Anonymous.[7] Maine Medical Center issued Crosby an out-of-work slip for Thursday, October 8, 2009 and Friday, October 9, 2009. PSMF ¶ 49.

The parties disagree about much of what follows, but the Plaintiff has produced evidence from which a factfinder could reasonably find that Crosby delivered this slip to Grantz and told Grantz that he had been in the hospital and was depressed, PSMF ¶¶ 49 and 91; that Grantz responded to Crosby's note and statements about his condition by giving him a "hard look," which Crosby understood to mean that Grantz was unhappy, PSMF ¶¶ 93-94; and that Grantz emailed a copy of the out-of-work note to Ruth Martin in F.W. Webb's human resources office, PSMF ¶¶ 96-98, spoke with Dyer about making adjustments for the period that Crosby would be absent from work, PSMF ¶ 99, and updated Blades regarding Crosby's absence. PSMF ¶ 100.

---

[6]    PSMF ¶ 46 and October 7, 2009 Maine Medical Center record 5.
[7]    PSMF ¶ 48 and October 7, 2009 Maine Medical Center record 8.

### 3. Immediate Circumstances Surrounding Crosby's Termination

Crosby returned to work on Monday, October 12, 2009. DSMF ¶ 57. Crosby's driver's license had expired on Saturday, October 10, 2009, but Crosby drove F.W. Webb's truck on Monday the 12th and Tuesday the 13th without a license. DSMF ¶¶ 57-58. On Wednesday, October 14, 2009, Dyer asked Crosby for a copy of his driver's license. PSMF ¶ 104. Crosby claims that he only realized upon pulling out his license that it was expired. PSMF ¶ 105. Crosby also claims that he told both Dyer and Blades that he did not have the money to renew his license, PSMF ¶¶ 107 and 112, and that he asked Dyer if he could get paid early that week so that he could renew his license. PSMF ¶ 109. Crosby claims that Dyer told him that Dyer would speak with Grantz about getting Crosby's paycheck to him early, and that he could move Crosby to work in the warehouse until his license was renewed. PSMF ¶¶ 110-111. Crosby worked in the warehouse on Wednesday and Thursday where, he said, he was familiar with warehouse practices from his prior work there in 2008. PSMF ¶¶ 148-149.

Crosby claims that Grantz and Dyer arranged to get Crosby's paycheck to him early so that he could get his license renewed. PSMF ¶¶ 118-119 and 121. Grantz and Dyer deny any such plan, and Blades claims that he told Crosby that he needed to immediately get his license renewed. Def's Resp. to PSMF ¶¶ 118-119, DSMF ¶ 61. Crosby did receive his check one day early, at around midday on Thursday, October 15, 2009. PSMF ¶ 120.[8] Crosby then got his license renewed and returned to

---

[8] The Defendant claims that Crosby received his check early because he was being terminated from his position. Def.'s Resp. to PSMF ¶ 121.

work. PSMF ¶¶ 126-127. Crosby claims he presented his renewed license to Dyer and Grantz and that Dyer stated, "good, because Skip is going on vacation tomorrow and I need you back on the road." PSMF ¶¶ 128-130. Dyer and Grantz deny speaking to Crosby that afternoon, but Grantz admits he received a copy of the renewed license and forwarded it to human resources. Def.'s Resp. to PSMF ¶¶ 128-130.

Meanwhile, on Thursday, October 15, 2009, Blades determined that Crosby should be terminated from his position and spoke with Ruth Martin in human resources about this. DSMF ¶ 73. Martin was concerned that Blades was recommending termination of an employee who had no previous progressive discipline. PSMF ¶ 172. Blades told Martin that he wanted to terminate Crosby's employment because Crosby drove without a license for two days, two additional days had passed and Crosby still had not gotten his license renewed, and this was causing a disruption in the workforce. PSMF ¶¶ 182-183. Blades also told Martin that Crosby was aware that he was driving without a license, and that Blades was frustrated with how long it was taking Crosby to get his license renewed. PSMF ¶¶ 184-185. Ruth Martin then discussed Crosby's termination with Robert Mucciarone, F.W. Webb's treasurer and CFO. PSMF ¶¶ 186-190. Mucciarone felt that Crosby's termination was justified based on the fact that he had driven F.W. Webb's trucks without a license for two days, and this created serious liability for F.W. Webb. PSMF ¶¶ 191-200. He and Martin did not review Crosby's driving record or discuss any extenuating circumstances or whether Crosby was being treated comparably or fairly as compared to other F.W. Webb employees in similar situations. PSMF ¶¶

201-203. Martin called Blades back later in the day on October 15, 2009, and told him that F.W. Webb approved the termination decision. DSMF ¶ 82.

On the morning of Friday, October 16, 2009, Crosby was terminated from his position with F.W. Webb. DSMF ¶ 89. Immediately following Crosby's termination, Dyer told Crosby that he could not believe that F.W. Webb let Crosby go and that if Crosby needed a reference they could call Dyer. PSMF ¶ 208. Dyer provided Crosby with his cell phone number. PSMF ¶ 208.

### 4. F.W. Webb's Treatment of Other Employees in Similar Situations

The Plaintiff has produced evidence from which a fact finder could determine that F.W. Webb had a practice of notifying its drivers when their licenses and DOT cards[9] were about to expire. PSMF ¶¶ 133-136 and 142. Grantz testified that he would typically receive notification in advance of the expiration of a driver's license and that he could not think of any case other than Crosby's in which he did not receive advance notification. PSMF ¶¶ 136-139. Grantz did not receive notification that Crosby's license had expired until three days after it had expired. PSMF ¶¶ 138-140.

The Plaintiff has also produced evidence that several F.W. Webb drivers had either had their licenses suspended for driving while intoxicated or had been cited for infractions while driving F.W. Webb trucks, but that these employees had not been terminated from their employment with F.W. Webb. One employee, Stephen,

---

[9]    Department of Transportation ("**DOT**") regulations require drivers of commercial vehicles to submit to medical examinations. If the examiner finds the driver physically qualified to operate a commercial motor vehicle, the driver is issued a certificate, referred to above as a "DOT card." *See* 49 C.F.R. § 391.43.

had his license suspended for 45 days in 2004 due to a DUI, and F.W. Webb moved him to a warehouse position. PSMF ¶¶ 229-231. Three other F.W. Webb drivers received DUI's while employed by F.W. Webb, and the company's response was to move these drivers into warehouse positions. PSMF ¶ 236. One driver, Shawn from Barre, drove an F.W. Webb truck after his DUI, but he was not disciplined for this infraction. PSMF ¶¶ 237-238. Mucciarone was aware that F.W. Webb had, in the past, responded to F.W. Webb drivers losing their licenses for DUIs by moving the employees into different positions. PSMF ¶ 246.

Several F.W. Webb drivers were cited for failing to maintain their driver's logs documenting their hours of service as required by DOT regulations, but none of these drivers were disciplined for these incidents. PSMF ¶ 251. On January 20, 2012, an F.W. Webb driver was cited by law enforcement for driving an F.W. Webb vehicle with an expired DOT card, but this driver was not disciplined for this incident. PSMF ¶ 252. One driver, Ben, was cited by law enforcement for driving a F.W. Webb vehicle with an unsecure load after part of the load, consisting of metal sinks, fell off of Ben's truck and caused a vehicle behind the truck to roll over. PSMF ¶¶ 215-218. Ben reported the incident to Blades, but Blades told Ben, "don't worry about it," and Ben did not receive any discipline in connection with the accident. PSMF ¶¶ 219-220.

## PROCEDURAL BACKGROUND

On April 23, 2012, the Plaintiff filed a six-count complaint asserting claims under the Americans with Disabilities Act, the Maine Human Rights Act, the federal Family Medical Leave Act, and Maine's Family Medical Leave Requirements. He

claims that that the Defendant regarded him as disabled, discriminated against him on the basis of his disabilities, failed to accommodate his disabilities, and retaliated against him by terminating his job for his use of leave, protected under the Maine Family Medical Leave Requirements and the federal Family Medical Leave Act, to address his conditions. On April 22, 2013, the Defendant filed its motion for summary judgment on all claims.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where, "the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Sensing v. Outback Steakhouse of Florida, LLC*, 575 F.3d 145, 152 (1st Cir. 2009) (citing *Carroll v. Xerox Corp.,* 294 F.3d 231, 236 (1st Cir. 2002) (citing Fed. R. Civ. P. 56(c)). "A 'genuine' issue is one that could be resolved in favor of either party, and a 'material fact' is one that has the potential of affecting the outcome of the case." *Id.* (citing *Calero–Cerezo v. U.S. Dep't. of Justice,* 355 F.3d 6, 19 (1st Cir. 2004) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248–50, 106 S.Ct. 2505, 91 L. Ed. 2d 202 (1986)).

The Court construes the record in the light most favorable to the nonmovant and resolves all reasonable inferences in that party's favor. *See id.* at 152-53. Thus, "to survive summary judgment a plaintiff is not required to rely only on *uncontradicted* evidence." *Id.* (citing *Calero–Cerezo,* 355 F.3d at 19 (1st Cir. 2004) (emphasis in original). Where the record contains inconsistencies "that favor in some

lights the defendants and in others the plaintiff," as long as the "plaintiff's evidence is both cognizable and sufficiently strong to support a verdict in her favor, the factfinder must be allowed to determine which version of the facts is most compelling." *Id.*

## DISCUSSION

### I. ADA/MHRA CLAIMS

The Plaintiff claims that the Defendant violated the Americans with Disabilities Act, 42 U.S.C. § 12101 (the "**ADA**") and the Maine Human Rights Act, 5 M.R.S.A. § 4553-A (the "**MHRA**") by terminating him from his position because of his disability and by retaliating against him for his use of protected leave.

### A. Disability Discrimination

Under both the ADA and the MHRA, the Plaintiff is required to meet the same three elements to articulate his claim for disability discrimination: (1) that he either suffers from a "disability" as that term is defined by the ADA/MHRA or is regarded as having a disability; (2) that he is an otherwise qualified individual, meaning that he is able, notwithstanding his disability, to perform the essential functions of his job with or without reasonable accommodation; and (3) that the Defendant was aware of his disability at the relevant time and adversely treated the Plaintiff because of his disability. *See Ramos-Echevarria v. Pichis, Inc.,* 659 F.3d 182, 186 (1st Cir. 2011); *Daniels v. Narraguagus Bay Health Care Facility*, 45 A.3d 722, 726 (Me. 2012).

The Defendant claims that the Plaintiff is not disabled within the meaning of the ADA or MHRA and that the Plaintiff cannot demonstrate that it terminated the Plaintiff from his position because of his disability.

       1.  Whether the Plaintiff May be Disabled Within the Meaning of the ADA

Under the ADA:

> The term "disability" means, with respect to an individual—
> **(A)** a physical or mental impairment that substantially limits one or more major life activities of such individual;
> **(B)** a record of such an impairment; or
> **(C)** being regarded as having such an impairment . . .

42 U.S.C. § 12102.

Under the ADA, as amended in 2008,[10] "[t]he definition of disability in this Act shall be construed in favor of broad coverage of individuals under this Act, to the maximum extent permitted by the terms of this Act." 42 U.S.C. § 12102(4)(A).[11] The "determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures," including such things as therapy, medication, or reasonable accommodations. 42

---

[10]    Under the ADA Amendments Act of 2008, Pub.L. No. 110–325, 122 Stat. 3553 (2008) (effective January 1, 2009), Congress rejected narrowing interpretations of "disability" in two Supreme Court cases, *Sutton v. United Air Lines, Inc.*, 527 U.S. 471 (1999) and *Toyota Motor Mfg., Kentucky, Inc. v. William*s, 534 U.S. 184 (2002), and in the EEOC rules, as inconsistent with its intent to "provide broad coverage" for individuals with disabilities.

[11]    Congress abrogated the holding in *Toyota v. Williams*, that the words "substantially" and "major" in the definition of disability "need to be interpreted strictly to create a demanding standard for qualifying as disabled." *Toyota v. Williams*, 534 U.S. at 197. Congress also rejected EEOC regulations that defined the term "substantially limits" as "significantly restricted," finding that this expressed too high a standard for determining a disability under the ADA. ADA Amendments Act of 2008, Pub.L. No. 110–325, § 2(a)(8), 122 Stat. 3553. Finally, Congress instructed courts "that the primary object of attention in cases brought under the ADA should be whether entities covered under the ADA have complied with their obligations, and . . . that the question of whether an individual's

U.S.C. § 12102(4)(E)(i);[12] 29 CFR § 1630.2(j)(5)(v). Further, an "impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active." 42 U.S.C. § 12102(4)(D).

The Defendant argues that alcoholism is not a per se disability under the ADA and that the Plaintiff was never formally diagnosed with a major depressive disorder. But the ADA does not require individuals to fit a preapproved list of diagnosed conditions to come within its definition of disability. It provides instead that a person is disabled if he has "a physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1)(A). Those life activities include "working." 42 U.S.C. § 12102(2)(a). Under these standards, the Plaintiff has articulated a triable issue of fact regarding whether he is disabled within the meaning of the ADA.

The Plaintiff required a one-month leave of absence in March of 2009 to deal with his alcoholism. At the beginning of his inpatient treatment, he was evaluated as having significant functional impairments. After this leave of absence, the Plaintiff returned to work for several months, for the most part without interruption. But the ameliorative effects of his treatments may have aided his ability to continue functioning. The Plaintiff relapsed, and, on October 7, 2009, he had been drinking and was hospitalized with depression. After this, he required another two days' leave from work. The Plaintiff has presented sufficient evidence that his alcoholism and

---

impairment is a disability under the ADA should not demand extensive analysis." ADA Amendments Act of 2008, Pub.L. No. 110–325, § 2(b)(5), 122 Stat. 3553.

[12]       The Amendment abrogated the Supreme Court's decision in *Sutton* that whether an impairment "substantially limits one or more life activities" should be determined after the mitigating effects of ameliorative measures were taken into account. *Sutton*, 527 U.S. at 488.

depression were comorbid and that when not adequately treated these impairments substantially limited his ability to work.[13]

The Plaintiff also claims that the Defendant regarded him as disabled under the third prong of the ADA and MHRA definitions of "disability." The Defendant requests summary judgment on this point solely on the basis that Blades was unaware of the Plaintiff's condition. But Blades' awareness of the Plaintiff's alcoholism and depression are in dispute, and, accordingly, summary judgment is not appropriate on this prong either. *See* Part I(A)(3)(i) below.

### 2. Whether the Plaintiff May be Disabled Within the Meaning of the MHRA

The MHRA states in pertinent part:

'Physical or mental disability' means:

    A. A physical or mental impairment that:

        (1)  Substantially limits one or more of a person's major life activities; [or]
        (2)  Significantly impairs physical or mental health . . . .

5 M.R.S.A. § 4553-A(1)(A). "Significantly impairs physical or mental health" means, in turn, "having an actual or expected duration of more than 6 months and impairing health to a significant extent as compared to what is ordinarily

---

[13]      By focusing on limitations on the Plaintiff's ability to work, the Court does not suggest that the Plaintiff may only demonstrate that he is limited in his ability to work. Rather, for purposes of summary judgment, it is sufficient to find that he has raised a triable issue of fact that his functionality was substantially limited in at least one major life activity.

      The Defendant has asked the Court to strike any reference to Plaintiff's treatment or condition after he was terminated from his job. Because the Court does not rely on any evidence of Plaintiff's post-termination condition in making its determinations, it need not reach this issue. The Defendant may raise this issue in any pretrial motions.

experienced in the general population." 5 M.R.S.A. § 4553-A(2)(B). "Alcoholism" and "major depressive disorder" are listed as disabilities "without regard to severity. . . ." 5 M.R.S.A. § 4553-A(1)(B).

The Defendant acknowledges that alcoholism is a per se disability under the MHRA. This alone is enough to get the Plaintiff past summary judgment on this element. But the Defendant again protests that the Plaintiff's depression does not rise to the level of a disability because he has not demonstrated that he is suffering from a "major depressive disorder." While the Plaintiff may not, at this point, have conclusively demonstrated that his depression is a disability under the MHRA, he has raised a triable issue of fact whether this is so. His treating healthcare provider first noted that the Plaintiff suffered from depression in February of 2009; in April of 2009, he attempted to treat his depression with Lexapro; and in October of 2009, Maine Medical Center treated him for depression. This spans a period of time greater than six months. A fact finder could rationally find on these facts that the Plaintiff's depression, even if not a diagnosed "major depressive disorder" was, alone or in combination with the Plaintiff's alcoholism, a significant impairment of the Plaintiff's health.

### 3. Whether the Defendant May Have Taken Adverse Employment Action Based on the Plaintiff's Disability

The Defendant claims that the Plaintiff cannot demonstrate that it fired him because of his disability for two reasons. First, the Defendant claims that the undisputed facts establish that Blades was not aware of the Plaintiff's alcoholism or depression when he determined that the Plaintiff should be terminated from his job.

Second, the Defendant claims that the undisputed facts establish the Plaintiff was let go for a legitimate, non-discriminatory reason: that he drove the Defendant's truck without a valid license for two days and failed thereafter to immediately renew his license.

### i. Whether Blades Knew of the Plaintiff's Alcoholism and Depression

The Plaintiff has proffered evidence from which a fact finder could determine that Blades was aware of the Plaintiff's alcoholism and depression when he determined that the Plaintiff should be terminated from his position. Although Blades did not become the general manager of the South Portland facility until the end of September 2009, he was working at this facility approximately two days a week with then-general manager Mike Cote when the Plaintiff, in March of 2009, took a one-month leave of absence to obtain treatment for his alcoholism. Cote was aware of the Plaintiff's leave of absence as well as the reasons for it.

Blades also acknowledged that, at some point after he became the general manager, operations manager Paul Grantz would make him aware when employees at the branch were out with a health condition where it would affect services, and he acknowledged that, if one of the four truck drivers was out, that would cause an impact.[14] When the Plaintiff again took time off from work on October 8-9, 2009, to deal with depression and alcoholism, Blades was the general manager, and the fact finder could infer that, in his capacity as general manager, Blades became aware of this leave of absence and also the reasons behind it.

---

[14]    *See* Pl's Resp. to DSMF ¶ 7 and Blades Dep. At 51-52 (ECF No. 43-4).

Finally, the Plaintiff claims he told Blades of his struggles with depression and hinted at the need for treatment at Spring Harbor. Blades's awareness of the Plaintiff's condition is disputed and is for the fact finder to determine.

### ii. Whether the Defendant's Decision to Terminate the Plaintiff's Job Was Based on His Disability

The Plaintiff lacks direct evidence of discrimination.[15] If a plaintiff lacks direct evidence of discrimination, "he may prove it indirectly 'by using the *prima facie* case and burden shifting methods that originated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).'" *Ramos-Echevarria*, 659 F.3d at 186; *see also Narraguagus Bay Health Care Facility*, 45 A.3d at 726-27 (applying the burden shifting analysis to evaluate MHRA employment discrimination claims at the summary judgment stage).

As part of an indirect prima facie case, the employee must provide evidence that he "was replaced by a non-disabled person or was treated less favorably than non-disabled employees." *Ramos-Echevarria*, 659 F.3d at 186 (internal citations omitted). "If he establishes a *prima facie* case, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its action." *Id.* at 186-187. "If the employer offers a non-discriminatory reason, the burden then shifts back to the

---

[15] The Plaintiff claims that, when he presented Grantz with an out-of-work note for October 8-9, 2009, Grantz gave the Plaintiff a "hard look," which the Plaintiff understood to mean that Grantz was unhappy. But, even if the Court considers this a "speaking" look that communicated disapproval of the Plaintiff's disabilities, the Plaintiff does not claim that Grantz was part of the group that made the decision to terminate him from his job or that Grantz exerted any influence over the decision-making process. *Cf. Walsh v. Town of Millinocket*, 28 A.3d 610, 615-16 (Me. 2011) ("an employer can be found liable for employment discrimination based on the discriminatory animus of an employee who intentionally influenced, but did not make, the ultimate employment decision" (citing *Staub v. Proctor Hosp.*, 131 S.Ct. 1186, 1189 (2011)).

plaintiff to show that the employer's justification is mere pretext cloaking discriminatory animus." *Id.* at 187.

In this case, the same facts that make up the Plaintiff's prima facie case that he was treated less favorably than non-disabled employees call into doubt the Defendant's stated reasons for discharging the Plaintiff from employment. The Plaintiff has provided evidence that the Defendant retained other drivers who, either through having their licenses suspended or through failing to renew a DOT card, became unqualified to drive the Defendant's trucks, including instances where unqualified drivers had driven the Defendant's trucks. *See Perkins v. Brigham & Women's Hosp.*, 78 F.3d 747, 751 (1st Cir. 1996) (employee "must show that the individuals with whom he seeks to be compared have 'engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992)).

The Defendant argues that all of the Plaintiff's examples are distinguishable because "[n]one of the drivers cited by Plaintiff had allowed their license to expire, drove a truck without a valid license, or failed to get their license renewed when instructed." Def's Reply in Support of Summ. J. 7 (ECF No. 50). But the Plaintiff need not provide exact analogs to his situation. The test is "'whether a 'prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated.'" *Velez v. Thermo King de Puerto Rico, Inc.*, 585 F.3d 441, 451 (1st Cir. 2009) (quoting *Perkins*, 78 F.3d at 751)).

The driver who drove with an expired DOT card did renew his card the same day he was told it was expired. But whether immediate license renewal is actually important to the Defendant is a disputed matter. The Plaintiff has provided evidence that several other drivers had their licenses suspended for driving while intoxicated, and yet they were retained by the Defendant in warehouse positions. The driver who drove with the expired DOT card and another driver who drove after his DUI are similarly enough situated to the Plaintiff for their cases to provide "fair congeners." *Id*. Neither of these other drivers were fired by the Defendant. The Plaintiff has established a triable issue of whether his termination was motivated by a discriminatory disability-based animus.

B. Retaliation

A prima facie case of retaliation under the ADA and MHRA requires the plaintiff to provide evidence that, "(1) [he] engaged in protected conduct; (2) [he] experienced an adverse employment action; and (3) there was a causal connection between the protected conduct and the adverse employment action." *Kelley*, 707 F.3d at 115, *Narraguagus Bay*, 45 A.3d at 728. These claims, like discrimination claims, are also analyzed under the burden-shifting framework. *See id.*

The Plaintiff has put forward sufficient evidence that he engaged in protected conduct when he requested and took time off from work in March of 2009 to address his alcoholism and when, on October 8-9, 2009, he requested and received time off from work to address his depression. *See Kelley,* 707 F.3d at 115 ("Requesting an

accommodation is protected conduct under the ADA's retaliation provision.")[16] The Plaintiff also argues that he requested an accommodation when, at some point after his return from leave in April of 2009 but before his October 7, 2009 hospitalization, he told Blades that he was having a hard time emotionally due to his divorce, was going to a doctor for depression, may need some time off, and was "thinking about going into Spring Harbor." PSMF ¶¶ 82-84. The Court need not decide for purposes of the motion for summary judgment whether this constitutes a "request for accommodation," since the Plaintiff has adequately demonstrated that he otherwise engaged in protected conduct.

One week after his second leave of absence, the Plaintiff was terminated from his position. This timing raises a triable issue regarding whether the Plaintiff was let go because he had requested leave to treat his disabilities. *See Collazo v. Bristol-Myers Squibb Mfg., Inc.*, 617 F.3d 39, 50 (1st Cir. 2010) ("When an adverse employment action "follows hard on the heels of protected activity, the timing often is strongly suggestive of retaliation."" (quoting *Noviello v. City of Boston*, 398 F.3d 76, 86 (1st Cir. 2005)); *Narraguagus Bay*, 45 A.3d at 728 ("Temporal proximity of an employer's awareness of protected activity and the alleged retaliatory action may serve as the causal link for purposes of a prima facie case."). The Defendant's stated reasons for terminating Crosby's job are called into question by the Defendant's

---

[16]     Although the Complaint contains two counts for failure to provide a reasonable accommodation—one under the MHRA and the other under the ADA—these theories are being pressed by the Plaintiff only as part of his claim that the Defendant retaliated against him for requesting and taking these accommodations. The Plaintiff is not pursuing a claim that the Defendant discriminated against him by failing to reasonably accommodate him under the ADA or MHRA.

disparate treatment of other similarly-situated employees, as outlined in Part I(A)(3)(ii) above.

## II. Violation of the Family Medical Leave Act and the Maine Family Medical Leave Requirements

The federal Family Medical Leave Act, 29 U.S.C. §§ 2601-2654 ("the "**FMLA**") and the Maine Family Medical Leave Requirements, 26 M.R.S.A. §§ 843-848 (the "**MFMLR**") protect employees from being discharged from employment for their use of protected leave under these statutes. *See* 29 U.S.C. § 2615(a)(2); 26 M.R.S.A. § 847(2). Among other things, an employee covered under the FMLA or MFMLR is entitled to leave to treat the employee's "serious health condition." *See* 29 U.S.C. § 2612(a)(1)(A); 26 M.R.S.A. § 843(4)(A).

The Defendant does not dispute that, based on its size and the amount of time the Plaintiff had been employed with the Defendant, the FMLA and MFMLR's protections extended to the Plaintiff. *See* 29 U.S.C. § 2611(2)-4), 26 M.R.S. § 844(1), PSMF ¶¶ 69-71. The Defendant also acknowledges that the Plaintiff's March-April, 2009 leave constitutes protected leave. But the parties dispute whether, in October of 2009, the Plaintiff was suffering from a serious health condition that qualified his October 7, 2009, request for time off as protected leave under these statutes. The term "serious health condition" is defined identically in both statutes as "an illness, injury, impairment, or physical or mental condition that involves: (A) inpatient care in a hospital, hospice or residential medical care facility; or (B) continuing treatment by a health care provider." 29 U.S.C. § 2611(11); 26 M.R.S.A. § 843(6).

The Plaintiff has put forward sufficient evidence for a fact finder to rationally conclude that his alcoholism and depression were chronic conditions that required continuing treatment from a healthcare provider. The Plaintiff was seen by Sterling several times in 2009 for these conditions, and Maine Medical Center also treated the Plaintiff on October 7, 2009, for these conditions. Therefore, the Plaintiff's October 8-9, 2009 leave may also have been protected under the FMLA and MFMLR. For the reasons stated in Section I(B) above, there is a material dispute regarding whether the Defendant discharged the Plaintiff from employment for his use of protected leave.

## CONCLUSION

For the reasons recited above, the Defendant's motion for summary judgment is **DENIED**.

SO ORDERED.

/s/ Nancy Torresen
United States District Judge

Dated this 26th day of March, 2014.